UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ABDUL MOHAMMED, | ) |
| Plaintiff, | ) 18 C 8393 |
| vs. | ) Judge Gary Feinerman |
| ERIN ANDERSON, SUSAN VIVIAN, and NAPERVILLE COMMUNITY SCHOOL DISTRICT 203, | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Abdul Mohammed brought this *pro se* suit against Naperville Community School District 203 and two of its officials, alleging that they falsely reported him to the Illinois Department of Children and Family Services ("DCFS") for committing child abuse. Doc. 1-1. Defendants have moved for inherent authority sanctions. Doc. 98. After reviewing the motion, the court ordered Mohammed to show cause why it should not invoke its inherent authority to dismiss this case with prejudice due to his serious and repeated misconduct, which the order identified. Doc. 102; *see Ayoubi v. Dart*, 640 F. App'x 524, 528 (7th Cir. 2016) ("Before exercising its inherent authority to sanction misconduct, a court must notify the litigant of the specific misdeed that is the basis for possible sanction and allow the litigant an opportunity to respond."). Mohammed filed two responses, Docs. 103, 111, addressed the matter in open court, Doc. 112, and then filed a third response, Doc. 116. Given the egregiousness and persistence of his litigation misconduct, this case is dismissed with prejudice.

1

## Background

The relevant facts are undisputed, consisting of various emails that Mohammed sent and phone calls that he made to Defendants' attorneys. Several examples follow. The grammatical, spacing, and spelling errors are Mohammed's.

**March 25, 2019.** In response to a direct but professional email from defense counsel asking that he not yell at her law firm's staff, Mohammed wrote: "Do whatever you like. This fuckin email is equivalent to the dirt of my shoes.I will also present a Motion for Sanctions against both of you. Just think that the process to get your ass sued has just started. I am taking this email as a threat." Doc. 98-4.

**April 15, 2019.** Mohammed sent an email to defense counsel with the subject line "Cry Babies" and with a photograph of a crying baby and a string of crying baby emojis in the body. Doc. 98-6.

**April 18, 2019.** In response to an email from defense counsel seeking proposed revisions to a draft joint status report, Mohammed wrote: "I will when I have time. There is no urgency and there is no Life and Death situation. Sit with some patience. Don't behave like you are some kind of a lawyer like Kathleen Zellner. FG [the initials of one of defense counsel] go ahead and file Motion for Sanctions against me. Also get prepared to drag your backsides to United States Senate Judiciary Committee." Doc. 98-7 at 1.

**May 22, 2019.** Mohammed sent defense counsel an email with a link to a YouTube video titled "The Depo From Hell: With Chaos, Blood and Violence," which was also the content of the email's subject line. Doc. 98-10; *see* https://youtu.be/A6KC2UNawYY (Mohammed's direct link to the YouTube video). Mohammed wrote in the email's body: "I don't know why but I get a kick when I watch this video." Doc 98-10.

**June 4, 2019.**  Mohammed wrote this email to defense counsel: "All your Interrogatories and production of Documents are just harassment and I trashed it in a [illegible emoji] in my kitchen. Further Interrogatories and production of Documents has caused me immense mental injury which will now result in a fresh round of complaints in various courts, administrative agencies etc."  Doc. 98-11.

**June 5, 2019.**  Mohammed sent this email to defense counsel: "These lame ass interrogatories had added more Counts and more Defendants to my impending Lawsuit. Harass me at cost of more Lawsuits, Charges, Administrative Complaints, Complaints to United States Senate Judiciary Committee, IDHR etc. I have the whole lot................the whole lot........................the whole lot....................................... at my disposal."  Doc. 98-12.

**June 6, 2019.**  Mohammed sent this email to defense counsel: "You ran away after the hearing like a coward. After the next hearing meet me in the cafeteria, I will give you a 45 minutes lecture on manners which your parents never taught you. Anyhow both of you are Ill mannered but it's not your fault, it's your parents fault, who did not disciplined you guys when the time was there to discipline you. Now nothing can be done as the time has passed and we the society and the community as a whole have to put up with you guys."  Doc. 98-13.  Then, in a comment directed to a defense counsel whom Mohammed apparently believes is of Iranian descent, he wrote: "The Iranis I know are very good people with great manners but I don't know what kind of an Irani you are, you are bringing disgrace to your community. Shameless Creatures and an utter disgrace to the whole human race itself. Have a Good Night."  *Ibid*.

**June 9, 2019.**  Mohammed sent this email to defense counsel: "I noticed that FG [again, the initials of one of defense counsel] has III as suffix to his name like he is an heir apparent to

British Throne. Shameless Creatures.Scumbags.Scourge of the Society. A bane to our Society. This email should raise the heat by few notches." Doc. 98-14.

**July 8, 2019.** Mohammed sent an email (in context, ominously so) to defense counsel with the subject line: "How is life treating you?", with only "????" in the body. Doc. 98-16.

**July 10, 2019.** Two days later, Mohammed sent another email that concluded like this: "I do not know why FG is not coming for hearings, maybe he is a milksop [illegible emoji]. If FG appears for the next hearing, do not runaway like a sissy after the hearing, I need to talk to you." Doc. 98-18; *see* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 788 (11th ed. 2003) (defining "milksop" as "an unmanly man").

**July 10, 2019.** Later that day, in response to a letter from defense counsel regarding interrogatories, Mohammed wrote: "If you don't like the answer that does not mean it is not an answer.Just imagine some namby-pamby Defendants and their namby-pamby lawyers committing violations and violating court orders, whose only claim to be considered as a human being; are their runny noses, stinky body odor, funny hair styles etc." Doc. 98-17.

**July 11, 2019.** Mohammed wrote this email to defense counsel following up on an unanswered email he sent the previous day: "Low Life reply to this email in next 5 minutes or else I will call your office. Reply to my emails in a timely manner. I own you." Doc. 98-20.

**July 11, 2019.** Mohammed sent an email to male defense counsel—the one he previously called a "milksop" and a "sissy"—with the subject line "Coward" and this text: "Hiding behind females.Wimp." Doc. 98-21.

**July 11, 2019.** Phone records show that Mohammed called defense counsel fifteen times in the span of just over eleven minutes. Doc. 98-22.

4

## Discussion

Parties may not behave inappropriately during litigation, and district courts may "fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). Sanctions may be imposed pursuant to rule, statute, or the court's inherent authority. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980) (describing the "'well-acknowledged' inherent power of a court to levy sanctions in response to abusive litigation practices"). Sanctions imposed under the court's inherent authority "are appropriate where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Tucker v. Williams*, 682 F.3d 654, 662 (7th Cir. 2012); *see also Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016) ("[A] court … pursuant to [its inherent] authority may impose appropriate sanctions to penalize and discourage misconduct."). Inherent authority sanctions "remedy prejudice to a party" and "deter future parties from trampling upon the integrity of the court." *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (internal quotation marks omitted).

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44; *see also Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 502 (7th Cir. 2009) ("A district court should be cautious when exercising such inherent authority … ."). The inherent power should be used "sparingly, to punish misconduct (1) occurring in the litigation itself, not in the events giving rise to the litigation …, and (2) not adequately dealt with by other rules … ." *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 391 (7th Cir. 2002); *see also Chambers*, 501 U.S. at 50 ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the rules, the court ordinarily should rely on the rules rather than the inherent power."). That said, "the court may safely rely

on its inherent power" when, in its informed discretion, "neither [a] statute nor the Rules are up to the task." *Chambers*, 501 U.S. at 50. For example, a court properly exercises its inherent authority when "conduct sanctionable under the Rules [is] intertwined within conduct that only the inherent power could address." *Id*. at 51. In such circumstances, "requiring a court first to apply Rules and statutes … to discrete occurrences *before* invoking inherent power to address [any] remaining … [mis]conduct" would prove too unwieldy. *Ibid*. (emphasis added). Accordingly, "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Id*. at 49; *see also Mach*, 580 F.3d at 502 ("[I]t is established that Rule 11 has not robbed the district courts of their inherent power to impose sanctions.") (internal quotation marks omitted).

Inherent authority sanctions are appropriate here. Mohammed's conduct towards defense counsel was persistent and reprehensible. Some of his emails were profane: "This fuckin email is equivalent to the dirt of my shoes"; "lame ass interrogatories"; and "Scumbags." Docs. 98-4, 98-12, 98-14. Some were inappropriately belligerent: "Just think that the process to get your ass sued has just started" and "Don't behave like you are some kind of a lawyer like Kathleen Zellner. … Also get prepared to drag your backsides to United States Senate Judiciary Committee." Docs. 98-4, 98-7. Some were threatening: "Lawsuits, Charges, Administrative Complaints, Complaints to United States Senate Judiciary Committee, IDHR etc."; "You ran away after the hearing like a coward. After the next hearing meet me in the cafeteria, I will give you a 45 minutes lecture on manners which your parents never taught you. Anyhow both of you are Ill mannered but it's not your fault, it's your parents fault, who did not disciplined you guys when the time was there to discipline you"; and "This email should raise the heat by few notches." Docs. 98-12, 98-13, 98-14. Some were inexplicably juvenile: the "Cry Babies" email;

"I noticed that FG has III as suffix to his name like he is an heir apparent to British Throne. Shameless Creatures.Scumbags.Scourge of the Society. A bane to our Society"; and "runny noses, stinky body odor, funny hair styles etc." Docs. 98-6, 98-14, 98-17. Some were sexist and arguably homophobic: "milksop"; "do not runaway like a sissy after the hearing"; and "Hiding behind females.Wimp." Docs. 98-18, 98-21. One was ethnically charged: "The Iranis I know are very good people with great manners but I don't know what kind of an Irani you are, you are bringing disgrace to your community. Shameless Creatures and an utter disgrace to the whole human race itself." Doc. 98-13. The email forwarding the "The Depo From Hell: With Chaos, Blood and Violence" YouTube video suggested that violence would occur during depositions in the case. Doc. 98-10. Finally, some of Mohammed's actions were, for lack of a better term, creepy. Over the course of just over eleven minutes, Mohammed made fifteen phone calls, which, in light of his emails, would cause a reasonable person to fear what he might do at a hearing or deposition. Doc. 98-22. Also creepy were the "I have the whole lot................the whole lot........................the whole lot....................................... at my disposal" email; the email with the "How is life treating you?" subject line; and the email stating, "Low Life reply to this email in next 5 minutes or else I will call your office. Reply to my emails in a timely manner. I own you." Docs. 98-12, 98-16, 98-20.

Mohammed's orchestrated and long-running campaign of harassment is sanctionable. Although the point is self-evident enough that citation of authority is unnecessary, these cases are instructive: *White v. Williams*, 423 F. App'x 645, 647 (7th Cir. 2011) (favorably citing a Fifth Circuit case holding that inherent authority sanctions are warranted where one side "sent threatening e-mails to opposing counsel"); *Kovilic Constr. Co. v. Missbrenner*, 106 F.3d 768, 772-73 (7th Cir. 1997) (noting that the court has the inherent power to "fashion [] appropriate

7

sanction[s] for conduct which abuses the judicial process") (quoting *Chambers*, 501 U.S. at 32); and *Castillo v. St. Paul Fire & Marine Ins. Co.*, 938 F.2d 776, 779-80 (7th Cir. 1991) (affirming inherent authority sanctions where the plaintiff threatened violence in a deposition).

Mohammed's arguments against sanctions are meritless. First, he maintains he did not willfully engage in misconduct. Doc. 103 at 1. This is preposterous, as Mohammed certainly knew that his actions were abusive and inappropriate. Second, Mohammed contends that his conduct was justified in light of the mistreatment he received from Defendants and defense counsel. *Ibid*. The record reveals no such mistreatment and certainly nothing that even remotely justifies the conduct described above. Third, Mohammed asserts that his emails were "satirical" and "regular banter" that "he did not think … would be offensive." *Ibid*.; *see also id*. at 2-3. This is, again, preposterous. Fourth, Mohammed submits that the undersigned judge "has been blind-sided by extremely cunning Defendants and their even more cunning attorneys who project themselves as some kind of reincarnation of Jesus Christ and has projected the Plaintiff as Judas Iscariot." *Id*. at 10. Good grief. Fifth, Mohammed contends that his conduct should be excused because he is not an attorney. Doc. 103 at 3-4, 10. But Mohammed's *pro se* status does not excuse his horrible behavior or insulate him from sanctions. *See Donelson v. Hardy*, 931 F.3d 565 (7th Cir. 2019) (affirming dismissal with prejudice due to the *pro se* plaintiff's misconduct during discovery); *Williams v. Wahner*, 714 F. App'x 601, 604 (7th Cir. 2018) (affirming dismissal, which the district court's docket entry indicates was with prejudice, due to the *pro se* plaintiff's bad faith during discovery); *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401-02 (7th Cir. 2015) (affirming dismissal with prejudice due to the *pro se* plaintiff's bad faith submission of falsified evidence).

Finally, Mohammed contends that because his emails are protected by the First Amendment, he cannot be sanctioned for them. Docs. 111, 116. That contention fundamentally misunderstands the law. The First Amendment might protect Mohammed from criminal liability for his emails, but it does not protect him from sanctions in a civil lawsuit. *See In re Kelly*, 808 F.2d 549, 550 (7th Cir. 1986) (deeming "frivolous" an argument that imposing Rule 11 sanctions "would violate the speech and petition clauses of the First Amendment"); *see also Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556-57 (2014) (declining to incorporate the *Noerr-Pennington* standard, which arises from the First Amendment, into a statutory provision allowing for fee shifting in exceptional patent cases); *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 537 (2002) (emphasizing that "nothing in [the Court's] holding [implicating *Noerr-Pennington*] should be read to question the validity of common litigation sanctions imposed by courts themselves—such as those authorized under Rule 11 of the Federal Rules of Civil Procedure—or the validity of statutory provisions that merely authorize the imposition of attorney's fees on a losing plaintiff"); *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 373 (7th Cir. 1987) ("[T]he proposition that the [*Noerr-Pennington* doctrine], or any other part of the Constitution, prohibits or even has anything to say about fee-shifting statutes in litigation seems too farfetched to require extended analysis.").

Because sanctions are appropriate, the question becomes whether the sanction should be dismissal or some lesser measure. Although "outright dismissal … is a particularly severe sanction," it "is within the court's discretion." *Chambers*, 501 U.S. at 45; *see also White*, 423 F. App'x at 646 ("District judges have the inherent authority to impose sanctions—including dismissal—when a litigant engages in conduct that abuses the judicial process."). The court may rely on its inherent authority to "dismiss a case for … bad faith conduct in litigation," *Greviskes*

9

*v. Univs. Research Ass'n, Inc.*, 417 F.3d 752, 758 (7th Cir. 2005), so long as dismissal is "proportionate to the gravity of the offense," *Montaño v. City of Chicago*, 535 F.3d 558, 563 (7th Cir. 2008). "[T]here is no requirement that the district court find prejudice" to the opposing party before dismissing a suit, "[n]or is there a requirement that a district court impose graduated sanctions." *Fuery v. City of Chicago*, 900 F.3d 450, 464 (7th Cir. 2018). Yet because "the sanction of dismissal with prejudice must be infrequently resorted to," the court must carefully consider whether a lesser sanction would be better suited to the circumstances. *Long v. Steepro*, 213 F.3d 983, 986 (7th Cir. 2000); *see also Ayoubi*, 640 F. App'x at 528 ("A court should generally consider lesser sanctions before settling upon dismissal.").

Under the circumstances of this case, including those following entry of the show cause order, Mohammed's misconduct justifies dismissal with prejudice. This is so for three principal reasons.

First, Mohammed's misconduct was serious and persistent, taking place over the course of several months. *See Fuery*, 900 F.3d at 454 ("As is often the case in life, … the whole of abusive action is greater than the sum of the parts of which it is made. Were we to view judicial abuses piecemeal, each one might not be worthy of sanctions, or even comment. But these incremental abuses chip away at the fair administration of justice … ."); *id*. at 464 ("Death by a thousand cuts is no less severe than death by a single powerful blow."). This was not a situation where a litigant slipped up just once, or twice, or even thrice. Rather, Mohammed engaged in outrageous behavior over an extended period, and its severity escalated over time.

Second, Mohammed displayed no remorse for his misconduct, either in his three written responses or his remarks in open court. When faced with the court's show cause order, Mohammed could have written or said something along the lines of: "This litigation puts into

question my relationship with my children. Naturally, the case is very emotional for me, and my passions overcame my good judgment. I promise to behave appropriately for the remainder of the case." Had he done so, a different result might be in order. Instead, Mohammed doubled down, stubbornly asserting that his conduct was justified, facetiously suggesting that he was only engaging in banter, and frivolously maintaining that his emails were constitutionally protected.

Finally, a non-dismissal sanction would be wholly inappropriate, for it would require defense counsel to continue interacting with a litigant who not only hurled months of sexist, ethnically charged, immature, belligerent, and creepy invective at them, but also impliedly threatened violence in the deposition room. No attorney should be put in that position. This court will not effectively put defense counsel in that position by allowing this case to proceed.

**Conclusion**

The court dismisses this lawsuit with prejudice in an exercise of its inherent authority. In addition, Mohammed must pay Defendants the reasonable attorney fees and costs they incurred in bringing his misconduct to the court's attention, including those expended in drafting their sanctions motion and appearing at hearings on the motion. *See Chambers*, 501 U.S. at 46 ("[I]f a court finds that … the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation … .") (internal citation and quotation marks omitted). By September 10, 2019, Defendants shall file a memorandum, with invoices and any other pertinent evidentiary support, establishing their fees and costs. Mohammed will have until October 1, 2019 to respond, and Defendants will have until October 15, 2019 to reply.

August 21, 2019

United States District Judge